[No. 3439.]

## OBE GOOD v. THE STATE.

1. SELF-DEFENSE — EVIDENCE.— In the trial of appellant for assault with intent to murder he relied upon self-defense, and the positive testimony upon that issue was conflicting. In support of his defense he proposed to prove that on the day after the rencontre there were cuts upon his neck and through his coat, and that there were no such cuts upon his person or clothing previous to the rencontre. He further offered proof that he told the witnesses who saw the cuts that they were inflicted by his antagonist during the rencontre and before he, the defendant, fired upon him. Upon objection by the State, the trial court excluded all the proposed proof. *Held*, that the ruling was correct in so far as it related to the defendant's statement, because that was a self-serving declaration and no part of the *res gestæ*. But the proof of the cuts found upon the defendant's neck and coat was competent, and should not have been excluded. The facility with which such *indicia* may be fabricated constitutes no valid objection to their competency as evidence under the circumstances of the present case; and though it does constitute an objection to the weight of such evidence, that is a matter for the consideration of the jury alone. See the opinion *in extenso* on these questions.

2. SAME — CASE DISTINGUISHED.— Note the distinction taken in the opinion between this case and that of *West* v. *The State*, 7 Texas Ct. App., 150.

APPEAL from the District Court of Colorado. Tried below before the Hon. George McCormick.

The conviction in this case was for an assault with intent to murder one George Dent, in Colorado county, Texas, on the 23d day of December, 1881. A term of three years in the penitentiary was the penalty assessed by the jury.

George Dent was the first witness introduced by the State. He testified that with the permission of his mother, several young gentlemen of the neighborhood gave a party at her house, on the night of December 23, 1881. Quite a large number of the young people of both sexes congregated at the house during the night. While the witness was aiding his mother in arranging the refreshment tables, and while the larger number of the guests were disporting in the main room, the witness heard loud cursing and swearing on the gallery in front of the house. The witness did not at first know who of the gentlemen guests was so offending. Having completed the preparations for serving refreshments on the table in the dining room, and invited the ladies to supper, the witness stepped out and met Mr. W. H. Harris at the door. Laying his hand on Harris's shoulder, witness remarked: "You will invite the

gentlemen in to supper as soon as the ladies are through." Just at this instant the defendant, who was standing on the gallery near by, uttered a loud yell. Witness thereupon turned from Harris, stepped up to defendant, and, laying his hand on the defendant's shoulder, said to him: "My friend, do you know whose house you are in?" Replying, "Yes, I do," the defendant caught the witness by the collar, drew witness up to him, jabbed a pistol against him, and fired, the ball striking the witness's stomach a little to the left of the center and, passing entirely through the body, lodging under the skin against the spinal column. The witness barely escaped death from the effects of the wound, and was confined to his bed for six or seven weeks, during a large part of which time he could not manage his body but had to be lifted about by others.

When the defendant fired the shot that wounded the witness, the witness caught him by the collar of his coat and drew or dragged the defendant towards him, going backwards some ten steps, when he, witness, fell from exhaustion, and the defendant fled. Witness had no knife in his hand when he approached the defendant, nor at any other time during the difficulty. Witness, being left handed, caught the defendant's collar with his left hand, and had no weapon of any kind in the other or in either hand. He was friendly with the defendant at the time, and approached the defendant, and spoke to him in a perfectly friendly manner. The discharge of the pistol set fire to the witness's coat and handkerchief. When the defendant sprang from the gallery in his flight he dropped his pistol, which witness's brother picked up. At this juncture the witness identified the pistol in evidence as the one his brother picked up on the scene of the shooting, and the ball in evidence as the one cut from his body.

The witness denied that he made any effort to cut the defendant, and reiterated that he had no knife in his hand at the time he was shot, or when he approached the defendant. He was not expecting a difficulty. When he stepped towards the defendant, and when he was shot, the witness had a small pocket knife in the right hand pocket of his pants, and that knife was found in that pocket after the witness was taken into the house. Quite a number of persons were on the gallery when the shooting took place. It was a dark and drizzly night, and the only light there was on the gallery was such as came from the lights in the guest room through the open door. A large number of ladies were in attendance upon the party, and the witness's only object in approaching and speaking to defendant as he did was to get him to stop shouting and cursing.

The defendant left the country, and the witness did not again see him after the shooting, until the present term of the court convened. The witness denied that, as he passed from the room to the gallery, he said to H. K. York: "I will go out and whip the d—d rascal," speaking of the defendant. Witness, as stated, had been assisting his mother in the refreshment room, and when he went from that room to the gallery, he did not know who of the guests was shouting and swearing. Witness choked the defendant and struck him several times in the face, after the defendant shot him, to prevent the defendant shooting a second time. Witness had no recollection of saying to John Webb: "If I had had the right kind of a knife, the defendant would not have shot me." Witness had no kind of a knife in his hand. Nor did he remember telling said Webb that he had the defendant nearly choked down when the shot was fired.

Tom Dent, a brother to the prosecuting witness, was the next witness for the State. He testified that while he was in the house with the company present, and entertaining some of the lady guests, he heard loud and offensive swearing on the gallery. He went out and ascertained that the disturbance was being created by the defendant. He asked the defendant to accompany him to the gate. Defendant said: "All right, by G—d." On reaching the gate, witness asked the defendant the occasion of his conduct. Defendant replied that he was cursing because the Misses Moore and McMillan had not been invited to the entertainment. Witness replied that the defendant had nothing to do with inviting the guests; that that was a matter concerning only his, witness's, mother and the young men who had charge of the party; and advised the defendant to be quiet, return to the house and enjoy himself. Defendant started back to the house, and the witness was called off by some one in the yard, and did not see the defendant again until after the shooting, which occurred within a very few moments. When the pistol fired, witness ran up to the gallery and found that defendant had the prosecuting witness, George Dent, down at the entrance of a small room cut off one end of the gallery. Witness pulled the defendant off his brother, and as he did so heard something drop from defendant's hand, which he afterwards found to be the four-shooter pepper-box pistol in evidence. Two chambers were loaded and two empty. This pistol the witness gave his mother as soon as he picked it up. But a few minutes elapsed between the time defendant left witness at the gate and the shooting. It was a very dark and drizzly night. The defendant was drinking. Witness did

not hear the defendant talking loud after he started from the gate back to the house.

Tom Conner was the next witness for the State. He testified that, on the day prior to the party at Mrs. Dent's, he and James Jones went up the country to get Jones's pistol. On their return next day, after they had passed through the town of Weimar, at about 4 o'clock in the evening, they met the defendant, John Mc-Millan, and a third party, whom the witness could not now call to mind. One of the parties asked the witness and Jones if they were going to attend the party at Mrs. Dent's that night. Witness and Jones replied that they did not know, and one of the three parties named remarked: "Come down; we are going and we expect there will be a row; we are going to raise h——ll." Jones went to the party, but the witness did not. Witness, having told his wife what defendant and his companions said about raising h——ll, was persuaded by her not to go. Witness and Jones had been drinking some when they met the parties named, but were not drunk. Neither witness nor Jones drew a pistol on meeting the parties, nor did either say that they were going to the party to "upset it, and turn the d——d thing upside down."

William Marshall testified, for the State, that he was standing on Mrs. Dent's gallery at the time, and saw the defendant shoot George Dent. He saw George Dent go to or towards the defendant, when the defendant rushed towards him and fired his pistol. The pistol fired before Dent had time to do anything. The shooting occurred near the door. Defendant and Dent scuffled back towards the gallery six or eight feet, Dent going backwards and defendant forwards. The reception room door was open, and the witness could see plainly by the light which came through it. Dent had no knife in his hand, or witness could and would have seen it. Dent had just come out from the room and had spoken to Mr. Harris, and passed on towards the defendant, who had been shouting and cursing on the gallery. Witness did not think that defendant and Dent got into the small room at the end of the gallery. Some one slammed the door to after the pistol fired, and witness was then unable in the dark to distinguish all of the parties on the gallery. Witness assisted in removing Dent to his room after he was shot.

W. H. Harris was the next witness for the State. He testified that just before the difficulty in which George Dent was shot, he, witness, was standing on the gallery in front of the reception room door. George Dent came to witness on the gallery and told him to invite all the gentlemen to the next table. Just then the defendant,

who was on the gallery, cursed in a loud voice, and Dent walked up to him and asked him: "Do you know whose house you are in?" Witness, who was in the act of turning to speak to Hatch York in the room, saw hands raised, but could not tell which of the two parties raised hands first. Just then the pistol fired. Defendant was then standing facing the witness, and Dent with his back towards witness. The blaze of the pistol came from towards the defendant. Witness rushed towards the parties and saw Dent staggering towards the wall. Dent had no knife in his hand that the witness saw. He did not see defendant's pistol, but saw the blaze when it was fired. When Dent fell, defendant jumped off the gallery and fled. Witness could not say that Tom Dent did or did not catch hold of the defendant after the shooting.

Witness assisted in carrying George Dent into his room after he was shot. Dent had no knife in his hand when witness reached him after he had fallen. Witness was one of the gentlemen who got up the party, and assisted in taking up the collection. Parties threw in whatever amount they pleased, and fifty cents was the amount charged each for supper. Hatch York and witness did not run out of the west room after the shot was fired, and no one closed the doors to prevent witness and York from going out; nor did the witness try to get out at the east door. On the contrary, witness was on the gallery when the shot was fired. Defendant, who seemed to have been drinking, was cursing and shouting before George Dent came out to the gallery. Defendant, his brother Jack, and John McMillan came to the party together. To the best of the witness's recollection, John Webb paid witness fifteen cents for his, defendant's, and Jack Good's suppers. James Jones, who was drinking, cursed and pulled out his pistol in the room after the shooting, in the presence of Dent and Webb.

Doctor Stockton, for the State, described the wound on George Dent's body, and testified that the wound was a very dangerous one, and such as in almost every instance would prove fatal. In his experience, which covered his service in the Confederate war, he had known but two instances out of many such cases to recover. Dent was confined to his bed about six weeks.

Sheriff Townsend testified, for the State, that the shooting of Dent occurred in December, 1881. He made every effort to capture the defendant, but could not learn of his whereabouts until in January, 1885, when he heard of his arrest in Bell county. Witness did not know whether the defendant surrendered to the sheriff of Bell county or not.

Mrs. Dent, the mother of George and Tom Dent, testified for the State that the pistol in evidence was the same pistol her son Tom Dent handed her after the shooting of George Dent. She locked it up that night, and had it under lock and key until the next morning, when she gave it to Tom to examine. In the mean time the pistol was touched by no one.

George Best, for the State, having examined the pistol and ball in evidence, described the pistol as an old pepper-box pistol, and declared the ball to be of a size to fit the said pistol. The State rested.

John McMillan was the defendant's first witness. He testified that when the shooting occurred he, Jack Good and Tom McMillan were standing on the gallery, Tom McMillan being nearest the belligerent parties. Witness saw George Dent when he came from the reception room to the gallery. He walked up to the defendant and said: "Do you know whose house you are in?" Defendant replied: "Yes, I do." Dent then caught defendant's collar with his left hand, and dragged him, choking him, some eight or ten feet down the gallery. He choked the defendant into a forward leaning position, and witness distinctly heard defendant at least three times tell Dent to release him. Dent had a knife in his right hand, which was hanging down by his right side. The defendant fired the shot which wounded Dent while the latter was choking him. As soon as the shot was fired some one slammed the reception room door and it became too dark to distinguish any one or anything that was transpiring on the gallery. Defendant was doing nothing when Dent assaulted him on the gallery. Witness did not see either Harris or Marshall on the gallery during the difficulty.

Witness was one of the three parties who met Tom Conner and James Jones near Weimar on that evening. Defendant and Jack Good were with the witness at that time. They were on their way to Weimar, and met the parties named just before reaching that town. Both Conner and Jones were drunk. Jones drew his pistol, leveled it on witness and party, and asked who they were, and was answered by witness. On separating, Conner and Jones said that they were going to the party at Mrs. Dent's that night, and were going to turn the d—d thing over and "bust" it up. Some one of witness's party replied: "Whoop 'em up." Witness and his party drank some at the town of Weimar, and went to the party that night together. Neither the witness nor the defendant were invited to that party, but went because it was a pay party and was public. Witness did not pay for his supper, nor did he see any one

else pay.   W. H. Harris took up a collection.   Witness saw the defendant and Tom Dent go out towards the gate just before the difficulty.   He heard the defendant use some oaths that night.   He also heard Jones and some other party swearing.   Witness remembered seeing W. H. Harris on the gallery a very short time before the difficulty occurred.   He did not see George Dent attempt to cut the defendant with his knife.   Witness saw no more of the defendant after the difficulty until the present term of the court convened.   The witness recognized the pistol in evidence as an old weapon which belonged to Jack Good, the defendant's brother.

Judd Williams was the next witness for the defense.   He testified that he was present on the gallery and witnessed the difficulty between defendant and Dent.   He saw Dent seize defendant by the collar and drag him some distance down the gallery.   He saw Dent cut at defendant several times with a knife, and heard the defendant, several times before he fired, demand to be released.   Witness at the time was standing on the gallery near the reception room door.   Other parties were nearer, and some others were farther from the belligerents than he was.   Of these several parties witness could only name John and Tom McMillan.   Witness could not say what kind of a knife it was that Dent used.   He had it in his right hand when witness saw it.   Witness could not describe the dress of either the defendant or Dent.   Messrs. Spooner and Mitchell, prosecuting counsel, asked witness what he knew about this case.   Witness was advised by defendant's friends to be discreet in his conferences with State counsel, and for that reason he told Messrs. Spooner and Mitchell that he knew but little about it.   Witness was not under oath when talking with District Attorney Spooner.

John Webb was the next witness for the defense.   He testified that he was at the party at Mrs. Dent's, but did not see the difficulty.   Some six weeks after the difficulty, during a ride from witness's house to Mrs. Dent's, George Dent told the witness that he had the d—d rascal, meaning defendant, nearly choked down before he, defendant, fired, and that if he, Dent, had had the right kind of a knife he would not have been shot.   He also said that he had every vein in defendant's head choked full of blood.   Witness could not remember whether he was riding a horse or a mule when this conversation took place.   He was going to look at some cattle, but he could not now remember what cattle.   It was his recollection, however, that he was on his way to look at cattle belonging to one Beverly, but of this he was not positive.   He did not remember the description of the horse ridden by George Dent.   Witness paid

Harris $1.50 for suppers for himself, defendant and Jack Good. Witness was in George Dent's room after George had been put to bed, and then told Mrs. Dent that he did all he could, before the difficulty, to prevail upon the defendant to quit cursing and shouting. James Jones was in the room at the time, and while there pulled out his pistol, cursed, and said that he would shoot the d—d rascal who shot George Dent. Defendant was drinking considerably on that night. Witness, though he paid for defendant's supper, was not then personally acquainted with him.

Jack Good, the defendant's brother, was the next witness in his behalf. He testified that he was invited to the party at Mrs. Dent's, by Tom Dent, who also authorized him to invite other persons. Witness saw George Dent seize the defendant, drag him several steps along the gallery, and cut at him several times with a knife. He heard Dent say to defendant: "I will cut your d—d heart out," and heard defendant demand his release. Both defendant and Jones were shouting and swearing, but Jones the most violently. Witness was one of the party who met Conner and Jones near Weimar on that evening. Conner and Jones were both drunk, and witness did not think that they at first knew witness and his party. They were both drunk. Conner and Jones told witness and his party that they were going to Mrs. Dent's party that night, and were going to turn the d—d thing over and raise h—ll. The pistol in evidence belonged to the witness. Defendant took it from the witness just before they reached Mrs. Dent's on the night of the difficulty. Defendant took it because he said that witness was drunk and had no use for a pistol in that condition. Witness, defendant and John McMillan went to the town of Weimar after leaving Conner and Jones, and, after drinking some whisky, went to Mrs. Dent's party. Dent had the knife in his right hand during the difficulty. Witness could not describe the knife. He tried to separate the parties when they came together. Defendant cursed some before the difficulty, but was not cursing when the difficulty began. Witness did not see Dent have a knife after the difficulty. Defendant ran off after the difficulty, and witness did not see him again until the trial term of this case. Tom and John McMillan were on the gallery at the time of the difficulty.

Hatch York, for the defense, testified that when the difficulty occurred he was in the reception room, talking to one W. H. Harris, and did not see the beginning of it. He and Harris started towards the front door together, but before they reached it some one closed it, and he and Harris had to go out of the room by another door.

In the mean time the shot was fired. Witness next saw the defend-
ant about sundown on the next evening, in the woods. He was then,
according to witness's recollection, dressed as he was on the previ-
ous night. Witness heard loud talking and cursing on the gallery
just before the difficulty. Jones was one of the parties who did the
cursing. Witness did not know who the other parties were. He
could not name the parties who were on the gallery when he and
Harris reached it.

G. T. Whitfield, Ferd Caldwell, M. H. Sanders and Drake Moore
testified that they had known the defendant for many years, and
knew that his reputation was that of a quiet and peaceable man.
According to Drake Moore, his brother-in-law, the defendant was
but recently out of a bed of sickness when the difficulty occurred.

A new trial was applied for upon the grounds:

1. That the court erred in overruling the application for a con-
tinuance.

2. That the court erred in admitting the testimony of the witness
Thomas Dent.

3. That the court erred in excluding the testimony of York and
Jim Good. (See first head-note of this report.)

4. That the court erred in failing to charge all of the law of the
case.

5. That the verdict was contrary to the law and evidence.

No brief for the appellant has reached the reporters.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. There is no dispute as to the fact that the de-
fendant shot George Dent with a pistol, but there is a conflict of
evidence as to the circumstances under which the shooting was
done. Several witnesses in behalf of the State testified that George
Dent, at the time he was shot by defendant, was unarmed, and was
not making any attack upon the defendant. Witnesses in behalf of
the defendant testified that Dent assaulted the defendant, caught
him with one hand by the collar, and with a knife, which he held in
the other hand, struck several blows at him. Other witnesses for
the defendant saw Dent have the knife at the time, but did not see
him use or attempt to use it.

Defendant offered to prove by a witness, York, that on the next
day after the shooting, late in the evening, he saw the defendant;
that defendant then had on the same clothes that he was wearing
when the shooting occurred; that he saw several cuts in the coat,

and also saw a cut on defendant's neck, and that neither defendant's coat nor throat were cut previous to the difficulty. He also proposed to prove by another witness, Good, his brother, that he saw the defendant on the same night of the difficulty, some three hours thereafter, and about nine miles distant from the place of the difficulty, and that defendant had a fresh knife-cut about an inch long on his throat and several knife-cuts on his coat. He also proposed to prove, by these witnesses, that the defendant, at the times referred to by them, told them that Dent had cut him on the throat, and had cut at him several times, cutting his coat, before he, the defendant, shot. Upon objection made by the district attorney, this proposed testimony was rejected and the defendant excepted.

There was no error in rejecting the testimony offered to prove the declarations of the defendant as to the cuts upon his coat and throat. Such declarations were not a part of the *res gestæ*, and come within the category of self-serving declarations. They were the defendant's talk about the facts, and not the facts talking through the defendant. (*Hobbs* v. *The State*, 16 Texas Ct. App., 517.)

But the testimony offered to prove the cuts on the coat and throat of defendant was, we think, admissible. These cuts were *physical facts* of an *exculpatory* nature, corroborating the testimony of the defendant's witnesses, who testified that they saw Dent cutting at defendant with a knife. The testimony as to them referred to a time reasonably proximate to the difficulty, and tended to throw light upon the transaction. "When we investigate a particular act alleged to have been committed, the mind naturally craves knowledge of everything that transpired at the time and place,— what was said and done by the parties involved,— so that we may be possessed of all the material that would in any wise aid in forming a judgment of the act, whether criminal or not, and, if culpable, to what degree. . . . No matter how slight the inference may be that can be drawn from a particular fact, it is competent to be considered as an element of the entire concrete of facts from which the deduction is to be made. . . . The defendant was entitled to prove any circumstance that might be calculated, however feebly, to sustain his hypothesis." (*Scott* v. *The State*, 56 Miss., 287; *Russell* v. *The State*, 11 Texas Ct. App., 288; Burrill on Cir. Ev., 508 *et seq.*)

In this case the defendant's hypothesis was that Dent assaulted him with a knife, cutting at him several times, cutting his coat and his throat, and that he shot Dent in self-defense. This hypothesis was supported by the testimony of his witnesses, while it was con-

tradicted by that of the State's witnesses. This vital issue was before the jury for their determination. It was the defendant's right to support his defense by every legitimate circumstance; that is, by every fact, however apparently trivial, which would tend in even a remote degree to that end. That fresh knife-cuts were seen upon his person a few hours after the rencontre might convince the jury that Dent had assaulted and attempted to kill him with a knife, and, if thus convinced, he might be acquitted. It was for the jury alone to pass upon the weight to be given to the evidence, and it is impossible for a court to say what effect or influence this rejected evidence might have produced upon the minds of the jury, had it been before them. That evidence of this character is easily fabricated is true, but this fact is no valid objection to its competency. It is an objection only to its weight, and such objection can only be considered by the jury. We are clearly of the opinion that the court erred in rejecting the testimony offered by the defendant to prove the fresh knife-cuts upon his clothing and person.

This opinion is apparently in conflict with *West* v. *The State*, 7 Texas Ct. App., 150, though it will be seen, upon an examination of the facts of that case, that the proposed evidence as to the cut upon the coat of the defendant was uncertain as to the exact time after the killing when such cut was observed. In holding the evidence as to the cut to be inadmissible in that case, the learned judge, in the opinion, cites no authority, and the reasons stated for the holding are, to the mind of the writer, far from convincing. It was doubtless under the authority of that decision that the learned trial judge rejected the testimony offered by the defendant.

Mr. Wharton says that "all facts that go either to sustain or impeach a hypothesis logically pertinent are admissible." (Whart. Cr. Ev., § 23.) If defendant, a few hours after the rencontre, had fresh knife-cuts upon his person, this would be a *fact* — a *physical fact*, not a mere declaration made by him, — and this fact would go to sustain a hypothesis logically pertinent, that is, that these knife-cuts had been inflicted in the difficulty with Dent. Suppose Dent had cut off a piece of the defendant's ear, and the piece had been found at the place of the difficulty, would it not be competent for the defendant to prove that on the next day after the difficulty a portion of one of his ears was missing, and that the ear had the appearance of having been freshly cut, and that the piece of ear found at the place of the difficulty fitted exactly to the wounded ear of the defendant? Suppose the witnesses who saw the knife in Dent's hand had described the same particularly, giving the length, width and

shape of its blade, would it not be competent to show that when the defendant was seen the next day he bore upon his person fresh wounds which corresponded exactly with the blade of the knife described by the witnesses? Suppose the blade had been broken while inflicting a wound, and a portion of it left in the wound, would it not be competent to prove this fact, and to prove that Dent was found after the difficulty to have a knife with a broken blade which exactly fitted to the piece found in the wound? These illustrations, it is true, would be more strongly exculpatory, and more directly connected with the main transaction than the fact which was proposed to be proved by the defendant in this case. But there can be no difference as to the principle governing the admissibility of such testimony. The difference is not as to competency, but as to weight. Its character is precisely the same in the instances supposed and in the instance we are considering, and the deductions or inferences arising from such evidence would differ only in their strength. The principle upon which such testimony is competent is that, if the cuts were inflicted during the rencontre, they are a part of the transaction and are *res gestæ*. It is not the *time* when the cuts are *first discovered* that controls the competency of evidence in regard to them. It is the time *when they were inflicted* that determines that question. If they were inflicted during the difficulty, they are *res gestæ*. If inflicted at any other time, they are irrelevant and inadmissible. Whether or not the cuts proposed to be proved in this instance were *res gestæ*, that is, a part of the transaction of the shooting of Dent by the defendant, was a question to be determined by the jury, and which should have been submitted to them. If the cuts were fabricated by the defendant, or were inflicted in any other way than by the act of Dent, of course it would be competent to show the facts, and it would be for the jury to determine from a consideration of the entire evidence whether or not these cuts were connected with the main transaction, and the manner of such connection, if any, and the effect which should be given to it with reference to the defendant's act of shooting.

We have examined and considered other questions presented in the record which we will not take time to discuss, leaving the case with the remark that the only material error committed on the trial was the rejection of the evidence offered to prove cuts upon the defendant; and for this error the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered April 22, 1885.]